THE PEOPLE OF THE STATE OF NEW YORK ex rel. VAL R. WITTICH, JR., Relator, against ROLLIN BROWNE et al., Constituting the State Tax Commission, Respondents.

BREWSTER, J. (dissenting). The question presented upon this review is whether relator has shown that respondents' assessment against him for the year 1936 of an unincorporated business tax imposed by article 16-A of the Tax Law is clearly erroneous, or, more immediately, whether relator has shown, by

clear and convincing proof (*People ex rel. Kohlman & Co.* v. *Law,* 239 N. Y. 346), that his occupation for the year 1936 was one wherein he rendered service to six separate companies as an employee and not as an independent contractor.

Up to about the middle of July, 1926, and for several years prior thereto, relator was in the employ of the Continental Supply Company whose principal office was in St. Louis, Mo., and beginning in 1921, in their export department, established under the name of Continental Well Supply, Inc., in New York City. Through his service to said company in St. Louis he had so developed his employer's export department that in July, 1921, he headed its organization in New York City when established there. When he left that employment he was under a salary of $500 per month. His uncontradicted testimony as to his purpose in leaving is as follows: " The purpose was to work for more than one company. I could see from my experience with the Supply Company that a New York office was an expensive undertaking and that there were perhaps two or three hundred smaller manufacturing companies throughout the United States who were dependent solely upon the four supply companies in New York to sell their products at their discretion so it occurred to me that a plan could be developed whereby I could work for more than one company. In other words, a group of companies for less than $500 a month but the aggregate total would net me considerably more annually than I could make with the supply organization in whose employ I was at that time." He was successful in achieving his objective and, in 1926, opened an office in New York City after contracting for his services with four different companies. Under that arrangement three of said companies each paid him a monthly salary as against earned commissions, and the fourth company, straight commissions, and out of his salaries and earnings he defrayed the cost of his office maintenance. The venture proved successful and in a general way he has continued it to date, his services still being rendered to one of the original four companies whom he began to serve in 1926. In the year in question, 1936, relator was under agreements to serve six noncompeting companies engaged in the manufacture of various machinery and equipment designed for use in the oil industry and his services in that connection had to do chiefly with their export or foreign trade. With three of these, the larger ones, he had written contracts and with the other three his arrangements were oral. His compensation, with the exception of one of them, was fixed on a commission basis.

As to the over-all picture which the agreements show, I think it may be fairly stated that the only phase of independent contractor status which may be said to have appertained was in the discovery of prospective customers for the purchase of various products of his companies in foreign markets. In the light of the contracts and as shown by the other evidence as to the way and manner the business was conducted, or relator's services rendered, it is convincingly clear that from the moment when the prospect was found, from then on, relator was under the control and subject to direction and supervision by the company whose products the opportunity for sale had been disclosed. This observation applies to his services to all the companies. He may be said to have had some freedom and independence in searching the field and bringing to light the possibility of a sale. If that developed successfully he would earn and receive his commission but in the earning of that, that is, in the development of the prospect and the making of the sale, full supervision and control were retained and exercised by the company to whom he had rendered his initial service of discovery. In addition to the flat salary which one of the companies paid him, his compensation depended upon commissions paid out of the proceeds collected

from completed sales; and out of his total earnings he defrayed his primary office expenses and made some other disbursements, for some of which he was reimbursed.

The relationship between relator and the companies to whom he rendered services was admittedly a novel one, and the method and means by which he was implemented to give that service were in some respects peculiar and novel. Viewing relator's occupation in its entirety and giving proper weight and significance to its various phases, I think it must be said that his role and status fails to conform to the essentials of independent contractorship. In a case of this kind, it seems to me, we are called upon to admeasure relator's occupation in gross, since it was only in the working out of the combination of all of its phases that his income and earnings which have been made the subject of the disputed tax, were produced. By this I mean that I do not think it is legally permissible to characterize his occupation as one of independent contractorship merely because that in one element of it, viz., discovery of prospects, he was somewhat free to act independently. In a controversy such as this it is always possible to point to some evidence of both relationships if the evidence is considered in piecemeal manner, but where many indicia or criteria have to be considered it is impossible to find a satisfactorily true and intelligent result without weighing the evidence as a whole. Where the gross weight of evidence can only give such a result I do not understand that a prohibition about our weighing of the evidence applies. There is nothing in the Tax Law which interdicts and the provisions of article 78 of the Civil Practice Act express authority to do so. Moreover, even as to this independent phase of his vocation, while his main employment was pointed to that objective, in other words, that was one of the things it was arranged for him to do, still, this characteristic of an independent contractorship did not in and of itself, and alone, produce any earnings. This because it was only in the development and ripening of the prospect and the resultant sale which brought him any compensation, aside from the straight salary increments paid by one of the companies; and, in the development and ripening of the prospect he was at all times under a rigid control by the company he served. Furthermore, the uncontradicted evidence is that even in relator's so-called independent field of action, considerable control was reserved. Instances of this are shown in his contract with the Reed Roller Bit Company and the Portable Rig Company, Inc., viz., (a) it was stipulated that his "right to sell" and to promote the same was given "when and as authorized by Employer", (b) the duty and obligation of the "Employee", among other things, were stated as follows: " (g) To co-operate with the Employer in the development of policies, and to endeavor in all ways to conduct the Employer's foreign *sales efforts with the same degree of thoroughness and careful regard for the Employer's interests* as if said Employer were *conducting* this foreign sales representing itself; " (underscoring supplied) and " (i) To provide suitable offices in New York City, N. Y., and maintain at all times a *competent* organization to properly look after Employer's interests; " (underscoring supplied). As to these latter provisions I think it must be said that the purport and meaning were that the "employer" reserved unto itself the right of a supervision and control over those stated activities of the relator. The standard of the employee's conduct was set forth as being that to which the employer would conform if conducting the "foreign sales representing itself". Who else than the employer, then, was to establish the methods of such conduct? Who else than the employer could make the rules, determine the policies, and change them from time to time? And, when so

established or altered it follows that the relator was bound to obey. Also, who other than the employer was to judge finally as to the suitability of the New York office establishment and competency of its organization? *These matters, of course, pertained directly to that field of relator's actions wherein it is said some independence and freedom of action is found.*

Permeating throughout the whole fabric of the constitution of his occupation the following threads of his companies' control are clearly shown, and are not disputed: All business, including solicitation and representation, transacted by relator was conducted in the name of the company he represented, and therein the company represented furnished all necessary stationery, catalogues, literature, and engineering data; relator had regular working hours from 9:00 A.M., to 5:00 P.M., "in regular routine activities", and a division of his time was arranged as to his different companies and this, in some instances at least, was checked by the companies; if time was taken off from office hours permission was secured; he was obliged to accept assistance of employer in preparation of sales letters describing the merits of products to be sold and which were to be used in a constant sales campaign; he did not advertise in his own name; change of office location was subject to the approval of the companies; control was reserved over his selection of office staff and employees (instanced by his being obliged to refrain from the employing of a stenographer who was formerly the employee of one of his company's customers); he was required to keep his companies constantly advised of what he was doing by frequent reports and was required to keep himself available for telephone calls and telegrams at all hours, even at his home; his suggestions and recommendations in sales negotiations were frequently rejected, and in such negotiations he was often advised and warned of "pitfalls and certain phases we should avoid discussing"; all of his companies had listed in their own names the same telephone number as his, and the same applied to the names on the office door maintained by relator and on the bulletin board on the ground floor lobby of the office building; in conducting sales negotiations he always obeyed instructions from the appropriate company. As to his compensation during 1936 one of his companies paid him a flat sum per month as salary and for said company's "share of his fixed office expenses," one of the office staff being selected and fully controlled by that company, plus commissions specified in the contract. Various of relator's office expenses were reimbursed by the companies, and as to the other companies compensation was arranged for on commission basis but in some cases money was advanced against future earnings. Relator bound his entire services to the companies he represented and under his agreements with them he was not at liberty to take on any other company save with their express approval, and on one occasion one company refused permission to relator to represent another concern.

I think it must be said that throughout the written contracts he had with three of the companies, and as reflected in other undisputed evidence, the policy and program of his service were such as to make his relationship that of an employee, which by the written contracts it was labeled, and to clearly distinguish it from the status of independent contractorship.

In *People ex rel. Tower* v. *State Tax Commission* (282 N. Y. 407, 409), note was taken of the indication that the legislative purpose in the enactment of article 16-A of the Tax Law was "not only to create a new source of revenue but also to lay a tax upon various types of non-corporate enterprises competing with corporations * * * which are required to pay a corporate franchise tax", and it is stated that: "The incidence of the * * * tax is upon those

businesses or vocations which, if conducted by corporations, would be subject to tax." In the case at bar both the capability and the likelihood at least, if not in truth the possibility of opportunity, for the rendition of the services in question were due to the personal experience, knowledge and aptitude of relator. It is difficult to see how a corporation could have rendered them. Relator appears to have been selected by the companies he represented because of an acquaintanceship, knowledge and capability personal as to him. The personality and individuality of his enterprise created his opportunity of service. While the general nature of his vocation was one suitable to corporate activity, it is apparent he was chosen solely because his personal service was desired. But, aside from this, the manner in which relator rendered his service, including the harmony required in its unison, his subserviency to control and the intimacy of his relationships with his companies, all this was such as to render his peculiar and unique vocation seemingly beyond the reasonable reach of corporate activity. In the *Tower* case (*supra*, p. 411) it was said that the reasons given by the statute (Tax Law, § 386) for the named exemptions from the tax made it " clear " that the legislative intent was " to reach by tax those vocations which, if conducted in corporate form, would be the subject of taxation." The foregoing was employed as " an aid to construction " in that proceeding which was to determine the taxability of earnings of a customhouse broker, and it was applied to the concession that such service was one which could be " ' conducted under corporate structure.' " (*People ex rel. Tower* v. *State Tax Commission*, 282 N. Y. 407, 411, *supra*.) In the instant case there is no evidence upon that phase of relator's activity, even as to its general field. Of course, we may take judicial notice that a corporation may act as a foreign sales representative as a permitted kind of endeavor, but query as to whether it could, in fact, act in the peculiar way in which relator's services were performed.

The determination under review should be annulled.

Hill, P. J., Heffernan and Lawrence, JJ., concur in decision; Brewster, J., dissents in opinion in which Foster, J., concurs.

Determination of the State Tax Commission confirmed, with $50 costs and disbursements, upon the authority of *Matter of Wilson Sullivan Co., Inc.* (289 N. Y. 110) and *Matter of Fidel Assn. of New York, Inc.* (259 App. Div. 486, affd. 287 N. Y. 626).